Estate of Philip Lichstein, Deceased, Faye Lichstein, Administratrix, and Faye Lichstein v. Commissioner.
Estate of Lichstein v. Commissioner
Docket No. 90998.
United States Tax Court
T.C. Memo 1962-252; 1962 Tax Ct. Memo LEXIS 56; 21 T.C.M. (CCH) 1335; T.C.M. (RIA) 62252; October 29, 1962
Benjamin B. Levin, Esq., for the petitioners. Malin Van Antwerp, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the income tax of petitioners in the amounts of $138.75 for 1957 and $2,038.20 for 1958. Petitioners claim an overpayment of $1,831.56 for the year 1957. The issue for decision is whether petitioners are entitled to deductions of $6,724.26 in 1957 and $4,948.86 in 1958, as Philip Lichstein's distributive share of losses claimed to have been sustained in those years in the operation of a partnership or joint venture. Findings of Fact Some of the facts have been stipulated, and, as stipulated, they are incorporated herein by reference. Philip Lichstein died November 3, 1960, and *57 Faye Lichstein, his widow, is the duly qualified and acting administratrix of his estate. Philip Lichstein and Faye Lichstein filed joint individual income tax returns for the years 1957 and 1958 with the district director of internal revenue at Camden, New Jersey. Philip Lichstein will sometimes hereinafter be referred to as the decedent. In the latter part of 1955 an extensive, prolonged strike was in progress in the American glass industry, and a glass shortage was developing. Irving Lewin, who was familiar with the glass business, interested Lawrence N. Stein, a lawyer, in the idea of purchasing glass in Europe and importing it to the United States while the domestic shortage continued. This was to be a "one-shot deal", and it was expected that the glass would be sold before it ever reached the United States by a sale of the contract to purchase it. Lawrence N. Stein brought decedent into the venture in the early fall of 1955. It was then orally agreed that decedent was to have a 45 percent interest in the venture; Irving Lewin, a 45 percent interest; and George Warren and Lawrence N. Stein, in the name of their law partnership of Warren & Stein, a 10 percent interest in lieu *58 of legal fees for professional services rendered. In October of 1955, Lewin made a trip to Europe to investigate possible sources of glass to be imported into the United States. While in Germany he learned from an import-export agent of a German chemical company of a possible source of glass in Roumania, but he was unable to go there because of travel restrictions on trips to communist nations. He returned to the United States in November of 1955 and informed Stein as to what had transpired and that he had been told by the agent of the German chemical company that the Roumanians were reluctant to sell glass to a speculator. He told Stein that it would facilitate the purchase of glass in Europe if he could tell them he represented a corporation dealing in glass, and Stein agreed to take care of this. Inter-Continental Import & Export Corp. (hereinafter referred to as Inter-Continental) was organized on December 31, 1955, and was granted a charter by the State of New Jersey. The certificate of incorporation stated that it was formed, among other things, to engage in import and export trade as principal or as the agent, broker, consignee or factor of others in respect of the acquisition, *59 transportation, shipment, purchase, sale, contracting for, dealing in, or other disposition of the products of the company and of goods, wares and merchandise in general, and to act commercially and generally as agent for other corporations, partnerships, associations and individuals, to the extent provided by the corporation laws of New Jersey. Inter-Continental never issued any stock, and there were no contributions to the capital of the corporation during the years 1956, 1957, or 1958. On January 13, 1956, Lewin went to Bucharest, Roumania, and completed the deal for the purchase of glass. The actual contract was entered into between Romano Exports, an instrumentality of the Roumanian government, and Wollhgang & Von Wingel, a German chemical firm. The contract was then transferred to Lewin who represented that he was acting for Inter-Continental. On February 16, 1956, after Lewin returned from Europe, there was filed with the Broad Street National Bank of Trenton, New Jersey, an authorization for the opening of a bank account in the name of Inter-Continental and the borrowing of money by it. The authorization signed by Lewin, as secretary, and bearing the corporate seal, certified *60 that the officers of the corporation were Lawrence N. Stein, president, George Warren, vice-president, Phil Lichstein, treasurer, and Irving Lewin, secretary, and that resolutions had been adopted at a meeting of its board of directors held on January 11, 1956, authorizing Stein and Lichstein to borrow money and obtain credit for the corporation from the bank and to sign checks made in the corporation's name. On February 16, 1956, $100,000 was borrowed from the Broad Street National Bank of Trenton and a letter of credit in the name of Inter-Continental was issued by the bank and sent to Europe. The loan was evidenced by a note signed in the name of Inter-Continental by "Lawrence N. Stein, Pres.", and was endorsed by Inter-Continental; Lawrence N. Stein and his wife, Delores L. Stein; Phil Lichstein and his wife, Faye Lichstein; Irving Lewin and his wife, Sylvia Lewin; and George Warren and his wife, Clarice K. Warren. This loan is shown as the first entry on the liability ledger of the Broad Street National Bank of Trenton, on sheets headed "Inter-Continental Export & Import". It was subsequently renewed by substitution of new notes in varying amounts, and remained in force until *61 June 25, 1959. Every subsequent note was signed in the name of the corporation and was endorsed by all of the individuals who had endorsed the original note, except Clarice K. Warren who endorsed only the second and third notes. The proceeds of the loan were deposited in a bank account in the name of Inter-Continental. Inter-Continental maintained no books or records other than a checkbook for the bank account in its name. The shipments of glass began arriving in the United States in the spring or early summer of 1956, at a time when the glass shortage had eased and the market was "collapsing". There was a provision in the contract to the effect that if the glass was not shipped by a certain date, the letter of credit could be terminated. The letter of credit was terminated under the terms of the contract before all of the glass was shipped, and the remaining balance in the bank account, about $35,000.00, was repaid to the bank. The glass which had been received was stored in the name of Inter-Continental in the Busch Terminal, a warehouse in New York, pending its disposition. Because of the market collapse, a ready market could not be found. Lewin undertook to sell as much as *62 possible to business acquaintances in the glass business, particularly suppliers of his own storm window business who were "obligated" to him. During the period from mid-1956 to mid-1959, about three years, there were 14 sales to a total of 12 customers. Sixteen hundred cases, two-thirds of the total purchased, were disposed of in this manner. The remainder, eight hundred cases, was used by Lewin in his own business and he was charged with their cost. Checks received from purchasers of glass were made payable to Inter-Continental and were deposited in its bank account. After all of the glass which had been imported was disposed of, the balance of the loan from the Broad Street National Bank of Trenton was liquidated on June 25, 1959, by a deposit in the corporation's account of four checks totalling $25,543.60. The entire transaction resulted in a loss of $26,659.59. In June of 1959, when the "venture was being wound up and the note at the Broad Street bank was being paid off", Lawrence N. Stein decided that a written partnership agreement should, be prepared and signed. The agreement which he then drafted was dated January 17, 1956, and was signed by himself, Lichstein, Lewin, *63 and Warren. After reciting that it was the desire of the parties to engage in the importing and exporting business as partners and to formalize their partnership agreement by the execution of a written agreement, the agreement provided, in part, as follows: 1. The parties do hereby form a partnership to engage in the importing, exporting and general merchandising business or any other business or businesses which the parties may from time to time decide to operate as partners, * * *. * * *
3. The partners shall make no immediate contribution to the capital of the partnership; however, the partners undertake and agree to pledge their personal credit to an extent sufficient to permit the partnership to borrow up to $100,000 in order to initiate and carry out the partnership business. * * *
4. Except as may hereinafter be stated, the net profits of the partnership shall be divided and the net losses shall be borne in ratios as follows: Phil Lichstein
45%
Irving Lewin
45%
George Warren and Lawrence
N. Stein, Partners, t/a War-
ren & Stein
10%
* * *
10. The partnership shall be and is hereby authorized to utilize the corporation previously formed, *64 known as Inter-Continental Import and Export Co., Inc., a corporation of the State of New Jersey, as agent for the limited purpose of importing window glass from certain European countries and for selling same in the United States market. * * * No Federal income tax return of any nature was filed by any business enterprise named "Inter-Continental Import & Export" or any variant thereof prior to July 1959. In June 1959 Inter-Continental's note to the bank was protested and decedent asked his own accountant to "find out why". The accountant was told that a partnership and not a corporate venture was involved and that Inter-Continental was used by the partners for the purpose of buying goods and "putting a front to the public" that the venture was not being operated by individuals. He examined Inter-Continental's checkbook and other miscellaneous data, determined that losses had been sustained, and prepared partnership returns for the years 1956, 1957 and 1958. These returns, which were filed on July 10, 1959, with the district director of internal revenue at Camden, New Jersey, were in the name of "Inter-Continental Import & Export Corp., AGENT FOR PARTNERSHIP." On these returns, *65 and on a partnership return bearing the same name filed in 1960 for the year 1959, the distributive shares of the losses were reported to be as follows: 1956
1957
1958
1959
Philip Lichstein
$315.66
$6,724.26
$4,948.86
$8.02
Irving Lewin
315.66
6,724.26
4,948.86
8.02
Warren & Stein
70.15
1,494.27
1,099.75
1.78
The accountant prepared the 1958 income tax return of decedent claiming therein the decedent's distributive share of the loss shown in the partnership return for that year, and also filed a claim for refund of 1957 taxes based on decedent's distributive share of the 1957 loss shown in the partnership return for that year. Respondent disallowed the claim for refund of the 1957 tax, asserting a small deficiency based on items which are not in controversy, and determined a deficiency for 1958, based on disallowance of the partnership loss and minor items which are not in controversy. Opinion RAUM, Judge: The loss deductions of $6,724.26 and $4,948.86 claimed by petitioners for 1957 and 1958, respectively, are based upon the contention that they were the decedent's distributive shares of losses allegedly sustained during those years *66 by a partnership of which he was a member. The Government, on the other hand, contends that the enterprise in question was being conducted by a corporation (Inter-Continental), and that such losses as may have been incurred during those years were sustained by the corporation rather than by a partnership. Petitioners urge that Inter-Continental was merely a "cover"; that it was intended to serve as an agent for a partnership which had been orally created; and that actually the corporation never even had sufficient substance to act as an agent and should be disregarded as a tax entity. Although there is testimony that Inter-Continental was formed for the psychological effect that a corporation would have on those with whom Lewin was dealing in Europe and to act as agent for a partnership, we are not convinced that it ever acted in that capacity. It was created by decedent and his associates in December 1955 and was granted a charter by the State of New Jersey. On February 16, 1956, Lewin, as secretary of the corporation, signed and filed with the Broad Street National Bank of Trenton an authorization for the opening of a bank account in its name and the borrowing of money by it. The *67 money necessary to carry on the venture was borrowed from the bank in its name; notes evidencing the loan were signed in its name, although endorsed by the interested individuals and their wives; the letter of credit issued by the bank was in its name; the glass was purchased in its name and shipped on bills of lading bearing its name as consignee; the glass was stored in its name in a warehouse pending sale; customer invoices were on billheads in its name; and checks issued by customers for glass purchased were made payable to it and were deposited in its bank account. There is no convincing evidence that in carrying on these activities any indication or representation was made to the bank or any of the other persons with whom the corporation dealt that it was acting other than for itself, or that there was any agreement that it would act as agent for a partnership. Under Inter-Continental's articles of incorporation, it could and did engage in business activities in its own behalf. "A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages." . *68 There is no merit to petitioner's position that the corporation should not be recognized as a taxable entity. It was neither a "sham", nor "front", nor "dummy", nor "cover". Cf. , approved in this respect but remanded on other grounds, (C.A. 2), certiorari denied, . Nor was it a mere nominee, holding bare legal title to property for the benefit of another. For whatever reason, it in fact engaged in business, and those who controlled its affairs may not now be heard to disavow either its very existence or the part that it played. Cf. (C.A. 2). We deem it significant that the execution of the purported partnership agreement in 1959 occurred at or about the time that the disposition of the glass had been completed and the decedent's accountant had determined that the venture had resulted in a loss. We are not convinced that this was not an afterthought motivated by a desire to substitute partnership operation for corporate operation for tax purposes. Our best judgment, after a careful consideration of all of the evidence, is *69 that the loss resulting from the purchase and sale of foreign glass was not sustained by a partnership of which decedent was a member, and the respondent did not err in disallowing the losses claimed for the years 1957 and 1958. [1]
To the extent that the decedent sustained a loss in the year of the winding up of the venture he is, of course, entitled to such deduction as the statute allows for that year; however, that year is not before us. Decision will be entered for the respondent. Footnotes
1. In the circumstances we do not find it necessary to pass upon the Government's alternative contention that, under the newly enacted provisions of Section 704(d) of the 1954 Code, there was no distributive partnership loss that the decedent could claim in 1957 or 1958 since he was not shown to have a basis of more than zero in the alleged partnership during those years, not having contributed any funds thereto prior to 1959.↩